******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CONNECTICUT ENERGY MARKETERS
ASSOCIATION *v.* DEPARTMENT OF
ENERGY AND ENVIRONMENTAL
PROTECTION ET AL.
(SC 19620)

Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued October 14—officially released December 29, 2016\**

*Alphonse M. Alfano*, pro hac vice, with whom were *Calvin K. Woo* and, on the brief, *Karen A. Mignone*, for the appellant (plaintiff).

*Robert D. Snook* and *Robert L. Marconi*, assistant attorneys general, with whom, on the brief, were *George Jepsen*, attorney general, and *Clare E. Kindall*, assistant attorney general, for the appellees (defendants).

*Opinion*

ROBINSON, J. The issue that we must address in this appeal is whether the issuance of a comprehensive energy strategy by the defendant Department of Energy and Environmental Protection (department), pursuant to a legislative directive, and the subsequent approval of a plan to expand the use of natural gas in this state by the department and the defendant Public Utilities Regulatory Authority (authority) constituted " 'actions which may significantly affect the environment' " within the meaning of General Statutes § 22a-1c,[1] thereby triggering the requirement for written evaluation of the expansion plan's environmental impact pursuant to General Statutes § 22a-1b (c).[2] The plaintiff, Connecticut Energy Marketers Association, brought this action against the defendants claiming that they violated the Environmental Policy Act (act), General Statutes § 22a-1 et seq., when the department issued a comprehensive energy strategy that contemplated a significant expansion of the use of natural gas in this state, and when both defendants approved a plan for such expansion, without evaluating the environmental impact of, among other things, an increase in the use of natural gas pursuant to § 22a-1b (c). The defendants filed separate motions to dismiss the plaintiff's complaint claiming that only "individual activities or a sequence of planned activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state, which could have a major impact on the state's" environmental resources; General Statutes § 22a-1c; constitute "actions which may significantly affect the environment" for purposes of § 22a-1b (c). Because they did not undertake any such activities, the defendants claimed, no environmental impact evaluation was required. The trial court agreed with the defendants and rendered judgment dismissing the complaint. The plaintiff claims on appeal[3] to this court that the trial court improperly determined that the defendants' activities did not constitute "actions which may significantly affect the environment" for purposes of § 22a-1b (c). We disagree with the plaintiff, and affirm the judgment of the trial court.

The record reveals the following facts, which are undisputed or were found by the trial court, and procedural history. In 2011, the legislature enacted General Statutes § 16a-3d, which directs the Commissioner of Energy and Environmental Protection to prepare a comprehensive energy strategy for the state every three years.[4] See Public Acts 2011, No. 11-80, § 51.[5] Pursuant to this directive, the department[6] issued a document entitled "2013 Comprehensive Energy Strategy for Connecticut" (comprehensive energy strategy) on February 19, 2013. As part of the comprehensive energy strategy, the department recommended a significant expansion of the use of natural gas in the state.

This proposal would require the expansion of natural gas pipeline capacity into the state, regulatory changes to enable certain customers to have their connections financed by the state's gas companies, the construction of approximately 900 miles of gas mains to provide access to consumers, and incentives for the state's gas companies to "ramp-up the required construction quickly . . . ."

The department also recommended that the state's gas companies submit a detailed conversion plan to the department and the authority. The department would then review the plan for consistency with the goals of the comprehensive energy strategy and the authority would assess the plan's potential impact on ratepayers. In June, 2013, the legislature enacted General Statutes § 16-19ww, adopting the department's recommendations. See Public Acts 2013, No. 13-298, § 51.[7]

Thereafter, Southern Connecticut Gas Company, Connecticut Natural Gas Corporation, and Yankee Gas Services Company (local distribution companies) submitted to the defendants a Joint Natural Gas Infrastructure Expansion Plan (expansion plan). The department found the expansion plan "to be generally consistent with the [comprehensive energy strategy] goals," but recommended several modifications. The local distribution companies made the recommended modifications and resubmitted the modified expansion plan to the defendants, at which time the authority commenced a contested case to investigate the plan's impact on ratepayers pursuant to § 16-19ww (c).[8] During the course of that proceeding, two parties submitted letters to the authority contending that the authority was required to prepare an environmental impact evaluation pursuant to § 22a-1b (c). In response, the authority issued a notice of request for written comments on that issue. The department submitted a letter to the authority contending that an environmental impact evaluation was not required because the authority was not the sponsoring agency for the proposed expansion of the natural gas distribution system, it was not funding the proposed expansion, it was not performing the proposed expansion and it would have no ownership interest in the proposed facilities. The authority issued a final decision approving the expansion plan without requiring an environmental impact evaluation.

The plaintiff, a trade association of more than 500 energy marketers who sell gasoline and heating fuel to residential and commercial customers throughout the state, then brought this action pursuant to General Statutes § 22a-16[9] in 2014 claiming that the expansion plan would increase the amount of natural gas escaping into the atmosphere, thereby exacerbating global warming,[10] and that it would also have other negative impacts on the state's environmental resources. The plaintiff sought a declaratory judgment that the defendants had

violated the act by failing to conduct an assessment of environmental significance or to prepare an environmental impact evaluation pursuant to § 22a-1b (c). The plaintiff also sought an injunction requiring the defendants to perform those acts.

The department filed a motion to dismiss or to strike the plaintiff's complaint claiming, among other things, that the department had not undertaken any " 'actions which may significantly affect the environment,' " as that term is defined in § 22a-1c, that would require the preparation of an environmental impact evaluation pursuant to § 22a-1b (c). The authority filed a separate motion to dismiss raising the same claim. The trial court concluded that, because the defendants were merely acting pursuant to the legislative directives contained in §§ 16a-3d and 16-19ww, their conduct did not come within the definition set forth in § 22a-1c and they were not required to prepare an environmental impact evaluation. Accordingly, the trial court concluded that the plaintiff had failed to state a claim pursuant to the act and rendered judgment dismissing the complaint on the ground that it lacked subject matter jurisdiction under the doctrine of sovereign immunity.[11] This appeal followed.

The plaintiff contends that the trial court incorrectly concluded that the department's preparation of the comprehensive energy strategy and the approval of the expansion plan by both the department and the authority were not " 'actions which may significantly affect the environment' "; General Statutes § 22a-1c; requiring an environmental impact evaluation pursuant to § 22a-1b. We disagree.

The question of whether the trial court properly dismissed the plaintiff's complaint turns on the proper interpretation of the phrase " 'actions which may significantly affect the environment' " as used in § 22a-1c, which is an issue of statutory interpretation that presents a question of law. *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, 310 Conn. 797, 808–809, 82 A.3d 602 (2014). "[A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Citations omitted; internal quotation marks omitted.) *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 163, 931 A.2d 890 (2007). Conversely,

"courts should accord deference to an agency's formally articulated interpretation of a statute when that interpretation is both time-tested and reasonable." Id.

In the present case, the defendants make no claim that their interpretation of § 22a-1c as excluding the department's preparation of the comprehensive energy strategy and the defendants' approval of the local distribution companies' expansion plan is time-tested, and this interpretation has not previously been subject to judicial scrutiny. Accordingly, our review is plenary.

"The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, supra, 310 Conn. 809.

We begin our analysis with the language of the relevant statutes. Section 22a-1b (c) provides in relevant part that "[e]ach state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment shall in the case of each such proposed action make a detailed written evaluation of its environmental impact before deciding whether to undertake or approve such action . . . ." Section 22a-1c provides in relevant part that, "[a]s used in sections 22a-1 to 22a-1i, inclusive, 'actions which may significantly affect the environment' means individual activities or a sequence of planned activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state, which could have a major impact on the state's land, water, air, historic structures and landmarks as defined in section 10-410, existing housing, or other environmental resources, or could serve short term to the disadvantage of long term environmental goals. . . ."

Thus, § 22a-1c provides that, to constitute " 'actions which may significantly affect the environment' " for purposes of § 22a-1b (c), activities must both (1) be "proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by

the state," and (2) potentially "have a major impact on the state's" environmental resources. The most natural reading of the phrase "proposed to be undertaken by an agency or agencies" is that the proposed or initiated activity that will allegedly have a major impact on the state's environment ultimately must "*be undertaken by an agency or agencies.*"[12] (Emphasis added.) See *Royce* v. *Heneage*, 170 Conn. 387, 392, 365 A.2d 1109 (1976) ("[t]he words of a statute should be interpreted in their natural and usual meaning"). Thus, activities that are proposed by state actors, but which are ultimately performed by private entities, do not constitute "actions which may significantly affect the environment" for purposes of § 22a-1b (c).[13]

This interpretation is supported by the legislative genealogy of the act. When the legislature originally enacted the act in 1973, the legislation provided that "[a]ctions which may significantly affect the environment shall include those projects *directly undertaken by state departments, institutions or agencies*, or funded in whole or in part by the state . . . ." (Emphasis added.) Public Acts 1973, No. 73-562, § 3 (P.A. 73-562). The legislative history of P.A. 73-562 indicates that the purpose of the legislation was to "[put] our state government and [its] agencies on the same footing in responsibility as our public and private industries." 16 H.R. Proc., Pt. 14, 1973 Sess., p. 7182, remarks of Representative Harold G. Harlow.[14] Thus, the legislature believed that, when the proposed activities are to be undertaken by private entities, there would be no reason to apply the act to the activities because private entities are already held responsible for the environmental impact of their activities under other laws.[15]

In 1977, the legislature amended the act by replacing the phrase "shall include those projects directly" with the phrase "are defined for the purposes of section 22a-1b as individual activities or a sequence of planned activities proposed to be . . . ." Public Acts 1977, No. 77-514, § 3 (P.A. 77-514). It is reasonable to conclude that the purpose of this amendment was to clarify that, if a state actor is considering whether it should undertake activities that could have a major impact on the state's environmental resources, the state actor should prepare an environmental impact evaluation *before* actually undertaking the activities.[16] Indeed, at the same time that the legislature amended this portion of the act, it amended the portion now codified as § 22a-1b (c) to provide that state actors must prepare an environmental impact evaluation "*before* deciding whether to undertake or approve" activities that may significantly affect the environment. (Emphasis added.) P.A. 77-514, § 2 (b). Nothing in the legislative history of P.A. 77-514 suggests that the legislature's intent was to substantially change the primary purpose of the 1973 legislation by making it applicable to proposed activities that are to be undertaken by private actors. Cf. *Doe* v. *Doe*, 244

Conn. 403, 434, 710 A.2d 1297 (1998) ("[w]e ordinarily do not infer a legislative intent to change [long-standing] and fundamental legislative policies without a clear indication of such an intent").

In the present case, the defendants have not proposed to undertake or to fund the activities that the plaintiff alleges will have a major impact on the state's environmental resources, namely, the construction of new gas pipelines in the state resulting in the increased discharge of methane gas into the atmosphere. Rather, these activities will be undertaken and funded by the local distribution companies, which are private entities. Accordingly, we conclude that the trial court properly granted the defendants' motions to dismiss on the ground that the requirement of an environmental impact evaluation in § 22a-1b (c) does not apply to their activities in the present case.

In support of its claim to the contrary, the plaintiff relies on § 22a-1a-1 (2) of the Regulations of Connecticut State Agencies, which defines an "action," as that word is used in General Statutes § 22a-1b (c), as an "individual activity or a sequence of planned activities *initiated or proposed* to be undertaken by an agency or agencies, or funded in whole or in part by the state." (Emphasis added.) Regs., Conn. State Agencies § 22a-1a-1 (2). The plaintiff contends that, under this regulation, an agency engages in an "action" when it initiates or proposes an activity that will be undertaken by any entity.[17] Thus, the plaintiff contends that § 22a-1a-1 (2) of the regulations, and, by extension, General Statutes § 22a-1c, should be interpreted to apply to an individual activity or a sequence of planned activities to be undertaken by any person or entity that is initiated or proposed by an agency. Because the department proposed the expansion of the use of natural gas in the state when it prepared the comprehensive energy strategy, the plaintiff argues, the local distribution companies' expansion plan was subject to the requirements of General Statutes § 22a-1b (c). We disagree. The plaintiff's interpretation would both require the insertion of words such as "to be undertaken by any person or entity" into § 22a-1a-1 (2) of the regulations and General Statutes § 22a-1c and render the existing phrase "to be undertaken" superfluous. See *Giaimo* v. *New Haven*, 257 Conn. 481, 494, 778 A.2d 33 (2001) ("we may not read into clearly expressed legislation provisions which do not find expression in its words" [internal quotation marks omitted]); *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980) ("[it is] well established . . . that statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant").

The plaintiff also relies on the language of § 22a-1a-1 (2) of the regulations providing that an "action" for purposes of General Statutes § 22a-1b (c) includes any

"activity for which an agency exercises judgment or discretion as to the propriety of that action." Regs., Conn. State Agencies § 22a-1a-1 (2). Because the department exercised judgment in preparing the comprehensive energy strategy, and because both defendants exercised judgment in approving the expansion plan, the plaintiff contends, those activities were " 'action[s]' " subject to § 22a-1b (c).[18] Again, we disagree. This portion of the regulation was intended to implement the portion of § 22a-1c providing that § 22a-1b (c) does not apply to "activities in which state agency participation is ministerial in nature, involving no exercise of discretion on the part of the state department, institution or agency."[19] General Statutes § 22a-1c. That language provides an exemption to the portion of § 22a-1c providing that "[s]uch actions shall include but not be limited to new projects and programs of state agencies and new projects supported by state contracts and grants . . . ." In turn, "[s]uch actions," as used in this portion of § 22a-1c, refers back to "activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state . . . ." Thus, § 22a-1a-1 (2) of the regulations applies only to activities that will be undertaken or funded by a state actor. Because the activities that the plaintiff alleges will cause major pollution will be undertaken by private parties, the defendants' activities in proposing and approving those activities do not fall within this definition regardless of whether they are discretionary or ministerial.

To the extent that the plaintiff contends that § 22a-1a-1 (2) of the regulations broadens the definition of " 'actions which may significantly affect the environment' " set forth in General Statutes § 22a-1c, we disagree. For the reasons that we have already explained, we do not believe that the language of the regulation is broader than the statute. Indeed, all of the specific examples of "actions" subject to § 22a-1b (c) set forth in § 22a-1a-1 (2) of the regulations involve actions to be undertaken or funded by state actors.[20]

Citing this court's decision in *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 63, 441 A.2d 68 (1981), overruled in part on other grounds by *Waterbury* v. *Washington*, 260 Conn. 506, 556, 800 A.2d 1102 (2002), the plaintiff also contends that we should construe §§ 22a-1b (c) and 22a-1c consistently with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 et seq. See *Manchester Environmental Coalition* v. *Stockton*, supra, 63 (Connecticut's act was modeled on NEPA); id., 67 n.20 (relying on NEPA to determine standard of review of agency's determination that no environmental impact statement is required).[21] The plaintiff points out that "there is '[f]ederal action' within the meaning of [NEPA] not only when an agency proposes to build a facility itself, but also whenever an agency makes a decision which permits action by other

parties which will affect the quality of the environment. NEPA's impact statement procedure has been held to apply where a federal agency approves a lease of land to private parties, grants licenses and permits to private parties, or approves and funds state highway projects." (Footnotes omitted.) *Scientists' Institute for Public Information, Inc.* v. *Atomic Energy Commission*, 481 F.2d 1079, 1088 (D.C. Cir. 1973). Even if we were to assume, however, that the act was generally modeled on NEPA; see footnote 21 of this opinion; there are significant differences between the two statutes. Of particular relevance here, NEPA does not define "[f]ederal actions," as that term is used in 42 U.S.C § 4332 (2) (C),[22] as "activities proposed to be undertaken by" federal actors. Compare General Statutes § 22a-1c. Rather, the implementing regulations for NEPA define "[f]ederal actions" broadly to "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, *or approved* by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; *and legislative proposals*." (Emphasis added.) 40 C.F.R. § 1508.18. We conclude, therefore, that the scope of the "[f]ederal actions" that are subject to NEPA is broader than the scope of activities by state actors that are subject to the act. If the legislature had intended for the term "actions which may significantly affect the environment" to have the same meaning under the act as the term "[f]ederal actions" has under NEPA, it easily could have expressly provided so in § 22a-1c.

The plaintiff further contends that, because the act is remedial in nature, we should construe it liberally. See *Manchester Environmental Coalition* v. *Stockton*, supra, 184 Conn. 57 ("[s]tatutes such as the [Connecticut Environmental Protection Act] are remedial in nature and should be liberally construed to accomplish their purpose"). The defendants contend that, to the contrary, "[w]hen the state waives sovereign immunity by statute . . . a party who wishes to sue under the legislative waiver must come clearly within its provisions because [s]tatutes in derogation of sovereignty should be strictly construed in favor of the state, so that its sovereignty may be upheld and not narrowed or destroyed." (Internal quotation marks omitted.) *Duguay* v. *Hopkins*, 191 Conn. 222, 232, 464 A.2d 45 (1983); see also *White* v. *Burns*, 213 Conn. 307, 312, 567 A.2d 1195 (1990) ("[w]here there is any doubt about their meaning or intent [statutes] are given the effect which makes the least rather than the most change in sovereign immunity"). These principles come into play, however, only when there is doubt about the meaning of the statute under review after this court has engaged in the full process of statutory interpretation. Cf. *State* v. *Courchesne*, 262 Conn. 537, 555, 816 A.2d 562 (2003) (rules of lenient or strict construction of criminal statutes come into play only when, "after the court has

engaged in the full process of statutory interpretation, there is nonetheless a reasonable doubt about [the] statute's intended scope" [internal quotation marks omitted]). Because we have no residual doubt about the meaning of § 22a-1c, we need not determine here which of these principles applies when they are in conflict.

The judgment is affirmed.

In this opinion PALMER, ZARELLA, and McDONALD, Js., concurred.

* December 29, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 22a-1c provides: "As used in sections 22a-1 to 22a-1i, inclusive, 'actions which may significantly affect the environment' means individual activities or a sequence of planned activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state, which could have a major impact on the state's land, water, air, historic structures and landmarks as defined in section 10-410, existing housing, or other environmental resources, or could serve short term to the disadvantage of long term environmental goals. Such actions shall include but not be limited to new projects and programs of state agencies and new projects supported by state contracts and grants, but shall not include (1) emergency measures undertaken in response to an immediate threat to public health or safety; or (2) activities in which state agency participation is ministerial in nature, involving no exercise of discretion on the part of the state department, institution or agency."

[2] General Statutes § 22a-1b (c) provides in relevant part: "Each state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment shall in the case of each such proposed action make a detailed written evaluation of its environmental impact before deciding whether to undertake or approve such action . . . ."

Although § 22a-1b (c) was the subject of a technical amendment in 2014; see Public Acts 2014, No. 14-122, § 130; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] The plaintiff appealed from the judgment of dismissal to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 16a-3d provides: "(a) On or before October 1, 2016, and every three years thereafter, the Commissioner of Energy and Environmental Protection shall prepare a Comprehensive Energy Strategy. Said strategy shall reflect the legislative findings and policy stated in section 16a-35k and shall incorporate (1) an assessment and plan for all energy needs in the state, including, but not limited to, electricity, heating, cooling, and transportation, (2) the findings of the Integrated Resources Plan, (3) the findings of the plan for energy efficiency adopted pursuant to section 16-245m, (4) the findings of the plan for renewable energy adopted pursuant to section 16-245n, and (5) the Energy Assurance Plan developed for the state of Connecticut pursuant to the American Recovery and Reinvestment Act of 2009, P.L. 111-5, or any successor Energy Assurance Plan developed within a reasonable time prior to the preparation of any Comprehensive Energy Strategy. Said strategy shall further include, but not be limited to, (A) an assessment of current energy supplies, demand and costs, (B) identification and evaluation of the factors likely to affect future energy supplies, demand and costs, (C) a statement of progress made toward achieving the goals and milestones set in the preceding Comprehensive Energy Strategy, (D) a statement of energy policies and long-range energy planning objectives and strategies appropriate to achieve, among other things, a sound economy, the least-cost mix of energy supply sources and measures that reduce demand for energy, giving due regard to such factors as consumer price impacts, security and diversity of fuel supplies and energy generating methods, protection of public health and safety, environmental goals and standards, conservation of energy and energy resources and the ability of the state to compete economically, (E) recommendations for administrative and legislative actions to implement such policies, objectives and strategies, (F) an assessment of the potential costs savings and benefits to ratepayers, including, but not limited to, carbon dioxide emissions reductions or voluntary joint ventures to repower some or all of the state's coal-fired and oil-fired generation facilities built before 1990, and (G) the benefits, costs,

obstacles and solutions related to the expansion and use and availability of natural gas in Connecticut. If the department finds that such expansion is in the public interest, it shall develop a plan to increase the use and availability of natural gas.

"(b) In adopting the Comprehensive Energy Strategy, the Commissioner of Energy and Environmental Protection shall conduct a proceeding that shall not be considered a contested case under chapter 54, but shall include not less than one public meeting and one technical meeting at which technical personnel shall be available to answer questions. Such meetings shall be transcribed and posted on the department's Internet web site. Said commissioner shall give not less than fifteen days' notice of such proceeding by electronic publication on the department's Internet web site. Not later than fifteen days prior to any such public meeting and not less than thirty days prior to any such technical meeting, the commissioner shall publish notice of either such meeting and post the text of the proposed Comprehensive Energy Strategy on the department's Internet web site. Notice of such public meeting or technical meeting may also be published in one or more newspapers having state-wide circulation if deemed necessary by the commissioner. Such notice shall state the date, time, and place of the meeting, the subject matter of the meeting, the manner and time period during which comments may be submitted to said commissioner, the statutory authority for the proposed strategy and the location where a copy of the proposed strategy may be obtained or examined in addition to posting the proposed strategy on the department's Internet web site. Said commissioner shall provide a time period of not less than sixty days from the date the notice is published on the department's Internet web site for public review and comment. During such time period, any person may provide comments concerning the proposed strategy to said commissioner. Said commissioner shall consider fully all written and oral comments concerning the proposed strategy after all public meetings and technical meetings and before approving the final strategy. Said commissioner shall (1) notify by electronic mail each person who requests such notice, and (2) post on the department's Internet web site the electronic text of the final strategy and a report summarizing all public comments and the changes made to the final strategy in response to such comments and the reasons therefor. The Public Utilities Regulatory Authority shall comment on the strategy's impact on natural gas and electric rates.

"(c) The Commissioner of Energy and Environmental Protection shall submit the final Comprehensive Energy Strategy electronically to the joint standing committees of the General Assembly having cognizance of matters relating to energy and the environment.

"(d) The Commissioner of Energy and Environmental Protection may modify the Comprehensive Energy Strategy in accordance with the procedures outlined in subsections (b) and (c) of this section."

[5] We note that § 16a-3d has since been amended by No. 13-298, § 23, of the 2013 Public Acts.

[6] The parties refer to the Commissioner of Energy and Environmental Protection, the department's internal Bureau of Energy and Technology Policy and the department itself interchangeably. Because the department is the named defendant, for the purpose of consistency, we refer to each of these entities as the department.

[7] We note that § 16-19ww has since been amended by No. 14-94, § 51, of the 2014 Public Acts.

[8] General Statutes § 16-19ww (c) provides: "In the event that the commissioner determines that the plan is consistent with the Comprehensive Energy Strategy pursuant to subsection (b) of this section, the Public Utilities Regulatory Authority shall, in a contested proceeding during which the authority shall hold a public hearing, approve or modify the plan not later than one hundred twenty days after such plan is submitted to the authority."

[9] General Statutes § 22a-16 provides in relevant part: "The Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ."

[10] According to the plaintiff, natural gas is composed primarily of methane, which "is more than [twenty] times as effective as carbon dioxide at trapping heat in the atmosphere . . . ."

[11] The trial court relied on this court's decision in *Stotler* v. *Dept. of*

*Transportation*, 313 Conn. 158, 185, 96 A.3d 527 (2014), for the proposition that, if a plaintiff fails to state a claim pursuant to a statute waiving sovereign immunity, the plaintiff's complaint is subject to dismissal, rather than to being stricken. See id. ("[W]e conclude that the Appellate Court properly determined that the plaintiff's complaint fails to state a claim under [General Statutes] § 13a-144. Therefore, the plaintiff's claim is barred by the doctrine of sovereign immunity and should have been dismissed by the trial court."). Ordinarily, a motion to strike is the proper procedural vehicle for challenging the legal sufficiency of a complaint. See *In re Michael D.*, 58 Conn. App. 119, 122, 752 A.2d 1135 ("[t]he purpose of a motion to strike is to challenge the legal sufficiency of the allegations of a complaint for failure to state a claim on which relief can be granted" [internal quotation marks omitted]), cert. denied, 254 Conn. 911, 759 A.2d 505 (2000). Although the plaintiff contends that the motions to dismiss filed by the defendants should have been treated as motions to strike, it does not claim that the trial court's interpretation of *Stotler* was incorrect and, therefore, even if the trial court properly determined that the defendants were not subject to the requirements of § 22a-1c, the judgment should still be reversed because the complaint was improperly dismissed instead of stricken. Cf. *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 501, 815 A.2d 1188 (2003) (when trial court improperly granted motion to dismiss claim that was properly subject to motion to strike, error was harmless when plaintiff did not claim that it could amend complaint to state legally sufficient claim).

We have serious questions as to whether § 22a-16 confers standing on the plaintiff to challenge the failure of the state to prepare an environmental impact evaluation pursuant to § 22a-1b, as the plaintiff alleges in its complaint. Whether the failure to prepare a report constitutes a claim of "unreasonable pollution" is, at best debatable. See id., 805 (to have standing to bring action pursuant to § 22a-16, plaintiff is required "to make a colorable claim of unreasonable pollution"). Nevertheless, because the parties have not raised nor briefed this question, we resolve today's issue on an alternative jurisdictional basis that was raised and briefed. See *Stotler* v. *Dept. of Transportation*, supra, 315 Conn. 158.

[12] Similarly, the plaintiff also contends that, under the language of § 22a-1b (c), any action that is initiated or proposed by a state agency and that may have a major impact on the state's environmental resources is an "[action] which may significantly affect the environment." See General Statutes § 22a-1b (c) (referring to "initiation of actions" and "proposed action"). The plaintiff contends that, because the defendants initiated or proposed the expansion plan under the ordinary meaning of those words, the defendants were required to conduct an environmental impact study pursuant to that statute. This argument is unavailing. Regardless of the meaning of the words "initiation" and "proposed," § 22a-1b (c) applies only to initiated or proposed activities that are to be "undertaken by state departments, institutions or agencies, or funded in whole or in part by the state . . . ." General Statutes § 22a-1c.

[13] The dissenting justice contends that this interpretation renders the language "proposed to be undertaken by state departments, institutions or agencies" in § 22a-1c superfluous because all actions taken by a state actor are funded by the state. We disagree. We do not believe that it was simply redundant for the legislature to make it clear that an environmental impact assessment is required *either* when a state actor undertakes the activity *or* when a private actor undertakes the activity, but the activity is funded by the state. In any event, it is far from clear that the state funds all activities by state actors, in whole or in part. We note, for example, that the federal government frequently funds state programs and projects, and, without having performed a comprehensive review of those activities, we are not prepared to say that the state contributes funding to all of them.

[14] Representative Harlow further stated that "[w]hat this bill does is [to direct] to the fullest extent possible [that] each state department, institution and agency be responsible for providing an environmental impact statement in terms of any activity on behalf of the state of Connecticut. This bill brings to complete circle the need for private industry, the public and state government to provide impact statements in terms of significant activity with regard to our environment." 16 H.R. Proc., supra, p. 7182.

[15] See Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 1973 Sess., p. 480 (testimony from legislative assistant acknowledging that private entities are subject to wide array of environmental laws and zoning regulations, but arguing that, because those laws are not adequate to protect environment, provisions of act should be expanded to apply to private

developers); compare *Rocky Hill* v. *SecureCare Realty, LLC*, 315 Conn. 265, 292, 105 A.3d 857 (2015) (assuming that entity that is found to be "arm of the state" would be "entitled to share the state's sovereign immunity" to actions to enforce zoning regulations).

[16] We note that, during the legislative debate on P.A. 73-562, concerns about the timing of the agency's preparation of an environmental impact evaluation were raised. See Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 1973 Sess., p. 475, remarks of Rita Boulby on behalf of the Commissioner of Environmental Protection (representing department's belief that "the real intent and the goal of the policy act is to . . . encourage and require agencies and institutions to develop within their planning process at a very early stage, environmental considerations").

[17] Specifically, the plaintiff states in its reply brief to this court that "[t]he words 'by an agency or agencies' [as used in § 22a-1a-1 (2) of the regulations] is a prepositional phrase which modifies both 'initiated' and 'proposed to be undertaken.' An agency engages in an 'action,' therefore, when it proposes that an activity or activities be undertaken."

[18] Specifically, the plaintiff contends that an "agency's approval of an activity or sequence of proposed activities constitutes an 'action' under the regulations if the activity may significantly affect the environment."

[19] The plaintiff contends that, to the contrary, this portion of § 22a-1a-1 (2) of the regulations derives from the portion of § 22a-1b (c) requiring "[e]ach state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment . . . in the case of each such proposed action [to] make a detailed written evaluation of its environmental impact before deciding whether to undertake or approve such action." We disagree. The language of the regulation clearly tracks the language of § 22a-1c. In any event, even if the plaintiff were correct, the word "actions" and the phrase "such action" as used in this portion of § 22a-1b (c) refer to "activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state"; General Statutes § 22a-1c; and we have concluded that this language refers to activities that ultimately will be undertaken by a state actor. This interpretation does not render the phrase "or approve" as used in § 22a-1b (c) superfluous, because that portion of the statute contemplates the situation in which a state actor conducts proceedings to determine whether it is authorized to and, if so, whether it should undertake certain activities before actually undertaking the activities.

[20] Section 22a-1a-1 (2) of the Regulations of Connecticut State Agencies provides in relevant part: "Actions include, but are not limited to, capital improvements, alterations, repairs, or additions to the real property of the state; acquisition of real property for the purpose of capital improvements; [and] lease/purchase agreements; grants-in-aid or financial assistance for housing, business, industry, restoration or demonstration projects . . . ."

[21] In *Manchester Environmental Coalition*, this court relied on the remarks of Senator Philip N. Costello, Jr., during the legislative hearings on P.A. 73-562 to support its statement that the act was modeled on NEPA. See *Manchester Environmental Coalition* v. *Stockton*, supra, 184 Conn. 63 n.13; Conn. Joint Standing Committee Hearings, Environment, Pt. 3, 1973 Sess., p. 1031, remarks of Senator Costello ("[t]he bill was modeled after [NEPA]"). The "bill" that Senator Costello was referring to, however, was not P.A. 73-562, but a previous version of the act that the legislature had passed in 1972. See Conn. Joint Standing Committee Hearings, supra, p. 1031; see also Public Acts 1972, No. 72-153 (P.A. 72-153). Governor Thomas J. Meskill vetoed that legislation on the ground that "it would require too much paper work and expense on the part of the state agencies . . . ." Conn. Joint Standing Committee Hearings, supra, p. 846, remarks of Senator Costello; see also Office of Legislative Research, Legislative History of the Connecticut Environmental Policy Act, January 30, 2008, 2008-R-0079, pp. 1–2 ("[t]he governor said [that P.A. 72-153] would overlap existing federal and state requirements, be too costly, and be onerous to administer"). After Governor Meskill vetoed P.A. 72-153, he issued an executive order "to achieve the vetoed act's 'essential purposes.' " Office of Legislative Research Report No. 2008-R-0079, supra, p. 2. In 1973, the legislature enacted P.A. 73-562, which generally tracked the language of Governor Meskill's executive order. See Office of Legislative Research, supra, p. 2. Senator Costello characterized P.A. 73-562 as "less in scope than [P.A. 72-153]." Conn. Joint Standing Committee Hearings, supra, p. 847; see also 16 S. Proc., Pt. 7, 1973 Sess., p. 3261, remarks of Senator Costello (characterizing P.A. 73-562 as "weaker than many would wish"); 16 H.R. Proc., supra, p. 7184, remarks of Represen-

tative Francis W. Ciampi ("[t]here are a number of areas in this bill which are much weaker than the vetoed act"); 16 H.R. Proc., supra, p. 7187, remarks of Representative Marilyn Pearson ("this is a weak bill"). Thus, while there are similarities between the act and NEPA, the act was not intended to have the same scope and meaning as NEPA in all respects.

[22] Title 42 of the United States Code, § 4332, provides in relevant part: "The Congress authorizes and directs that, to the fullest extent possible . . . (2) all agencies of the [f]ederal [g]overnment shall . . . (C) include in every recommendation or report on proposals for legislation and other major [f]ederal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . (i) the environmental impact of the proposed action . . . ."