******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## JEFFERSON SOLAR, LLC *v.* FUELCELL ENERGY, INC., ET AL.
### (AC 45620)

Bright, C. J., and Cradle and Harper, Js.

*Syllabus*

The plaintiff, a renewable energy developer, brought a third action seeking to invalidate the winning bid by a competing energy developer, the defendant F Co. and its subsidiary, for a long-term clean energy contract with a utility company, the defendant I Co. The plaintiff and F Co. submitted bids in response to a request by I Co. for proposals to construct a shared clean energy facility that would sell energy to the public. Bidders were required to show that they had either control of the generation site, an unconditional right to acquire control or an unconditional option agreement to purchase or lease the site. F Co.'s bid, which contained an option to lease agreement, was selected by I Co. and ultimately approved by the Public Utilities Regulatory Authority. In a prior action the plaintiff brought against F Co., *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.* (213 Conn. App. 288) (prior action), the trial court rendered judgment dismissing the action, which this court affirmed on appeal. The trial court determined that the plaintiff's claims were moot and that it lacked standing to seek a declaratory ruling as to the viability of the option agreement. The court further determined that the plaintiff lacked standing as to its claims for tortious interference with prospective contractual relations and unfair trade practices. In the present action, the plaintiff claimed that F Co.'s bid did not meet the site control requirement and sought declaratory and injunctive relief to void F Co.'s bid and the contract it was awarded as well as damages based on various legal theories, including unfair trade practices. The defendants filed a motion to dismiss, contending that the plaintiff lacked standing to pursue its claims. The trial court granted the motion, concluding that the plaintiff lacked standing to pursue its claims against F Co. for declaratory and injunctive relief because the plaintiff was a disappointed bidder for a public contract that failed to demonstrate fraud, corruption or favoritism that undermined the integrity of the bidding process. The court further determined that the plaintiff lacked standing because the damages it sought, lost profits from the contract that was awarded to F Co., were indirect and too remote from the defendants' allegedly wrongful conduct in submitting and accepting F Co.'s bid. On the plaintiff's appeal to this court, *held*:

1. This court determined, consistent with its reasoning in the prior action, that the plaintiff lacked standing to assert its various causes of action for monetary damages because the injuries it alleged were indirect and too remote from F Co.'s alleged wrongdoing: the plaintiff's claimed

injuries and the defendants' allegedly wrongful conduct were the same in both actions, as the plaintiff's appellate counsel stated during oral argument before this court that there was no meaningful difference between the unfair trade practices claims in both actions, and the plaintiff's other counts that sought damages were based on the same allegation in the prior action that F Co.'s bid did not comply with the site control requirement because the option to lease was invalid; moreover, contrary to the plaintiff's assertion that the trial court in the prior action based its decision on a different complaint with different allegations and lacked the benefit of F Co.'s concession in the present action that its bid certification was no good, the trial court's findings and ultimate conclusion in the present action regarding the remoteness of the plaintiff's claimed injuries were consistent with this court's reasoning in the prior action, which applied with equal force in the present case; furthermore, the record supported the trial court's finding that the plaintiff's claimed injuries were too speculative because there were too many links in the chain of causation for F Co.'s conduct to be the direct cause of the plaintiff's injuries and the Public Utilities Regulatory Authority retained discretion in awarding contracts.

2. The trial court properly concluded that the plaintiff lacked standing to assert its claims for declaratory and injunctive relief because it was a disappointed bidder on a public contract that failed to demonstrate fraud, corruption or favoritism that undermined the bidding process: the plaintiff's claim that the contract was not a public contract because the state was not a counterparty was unavailing, as the contract was awarded pursuant to competitive bidding in a public procurement process that was developed by and subject to the oversight of two state agencies; moreover, the plaintiff's reliance on the program requirements to challenge the award was no different from a disappointed bidder's reliance on state or municipal bidding statutes when challenging the award of a government contract, the program requirements, like competitive bidding laws, having been established for the benefit of the public, not bidders, and the trial court's application of standing rules regarding disappointed bidders on public contracts represented a proper balance between fulfilling the purposes of competitive bidding rules and preventing frequent litigation that might result in extensive delays in the commencement and completion of government projects to the detriment of the public; furthermore, even if, as the plaintiff contended, the contract were a public contract and the trial court improperly failed to find that F Co. knew its bid certification was false and that I Co. undermined the integrity of the bidding process by ignoring the program requirements, nothing in the record showed that F Co.'s bid did not conform to the site control requirement or that I Co. applied that requirement differently to other bidders, as I Co., which was permitted to select bids with option leases, applied the program requirements in a consistent, nondiscriminatory fashion.

Argued October 19, 2023—officially released April 16, 2024

*Procedural History*

Action for, inter alia, a declaratory judgment invalidating the award of a contract to the named defendant et al. for a shared clean energy facility, and for other relief, brought to the Superior Court in the judicial district of New Britain and transferred to the judicial district of Stamford-Norwalk, Complex Litigation Docket, where the court, *Ozalis, J.*, granted the motion to dismiss filed by the named defendant et al. and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*Thomas Melone*, for the appellant (plaintiff).

*Erick M. Sandler*, with whom, on the brief, were *Johanna S. Lerner* and *Lauren G. Moscato*, for the appellees (named defendant et al.).

*Jennifer L. Morgan*, with whom, on the brief was *Julie A. Lavoie*, for the appellee (defendant United Illuminating Company).

*Jill Lacedonia*, assistant attorney general, and *William Tong*, attorney general, filed a brief for the appellee (defendant Department of Energy and Environmental Protection).

*Opinion*

BRIGHT, C. J. The plaintiff, Jefferson Solar, LLC, appeals from the judgment of the trial court dismissing the action as to the defendants FuelCell Energy, Inc., and SCEF1 Fuel Cell, LLC (collectively, FuelCell),[1] and the United Illuminating Company (United Illuminating).[2] On appeal, the plaintiff claims that the court

[1] SCEF1 Fuel Cell, LLC, is a subsidiary of FuelCell Energy, Inc., that was created to be the entity that would submit a bid in response to the request for proposals at issue in the present case. For simplicity, we refer to both entities as FuelCell in this opinion.

[2] The plaintiff also named the Department of Energy and Environmental Protection (department) as a defendant in the underlying action. The trial court dismissed the action as to the department in a separate decision, and the plaintiff does not challenge the judgment as to the department on appeal.

improperly concluded that the plaintiff lacked standing
to assert its claims. We disagree and, accordingly, affirm
the judgment of the trial court.[3]

The following facts, either as found by the trial court
after an evidentiary hearing on the defendants' motion
to dismiss or as undisputed in the record, and proce-
dural history are relevant to the plaintiff's claims on
appeal. The present case arises from a 2020 request for
proposals (request) jointly issued by the state's two
electric distribution companies (electric companies),
United Illuminating and Eversource Energy (Ever-
source), " 'for the purchase of any energy products and
renewable energy certificates' produced by any eligible
Class I Shared Clean Energy Facility"[4] under "Year 1"
of the shared clean energy facility program (program).
See General Statutes § 16-244z (a) (1) (C).[5] The program
requires the electric distribution companies to conduct
a procurement process for shared clean energy facilities

We note that the department nevertheless filed a brief in support of affirming
the court's judgment and that it is an appellee in a separate appeal brought
by the plaintiff challenging the dismissal of its action against the department.
See *Jefferson Solar, LLC* v. *Dept. of Energy & Environmental Protection*,
224 Conn. App. 688,      A.3d      (2024).

All references to the defendants in this opinion are to Fuel Cell and United
Illuminating only.

[3] The trial court also dismissed the plaintiff's claims on the ground that
they were moot, and the plaintiff has challenged that alternative basis for
the court's judgment on appeal. Because we agree with the court's conclusion
that the plaintiff lacks standing to assert its claims, we do not address the
mootness issue. See, e.g., *Healey* v. *Mantell*, 216 Conn. App. 514, 527, 528
n.10, 285 A.3d 823 (2022) (noting that, although courts are not required to
address jurisdictional claims in specific order, courts should "address first
the issue that disposes of the case").

[4] A shared clean energy facility is an electric generation facility that uses
renewable resources, including but not limited to, solar and wind power,
fuel cells or geothermal sources. See General Statutes § 16-244x (a) (1); see
also General Statutes § 16-1 (a) (20).

[5] We note that the legislature amended § 16-244z subsequent to the events
at issue. See, e.g., Public Acts 2023, No. 23-102, § 25. Because those amend-
ments are not relevant to this appeal, we refer in this opinion to the current
revision of § 16-244z.

on an annual basis for six years. General Statutes § 16-244z (c) (1) (B). The program allows customers of the electric companies who are unable to generate their own clean energy to purchase clean energy from shared clean energy facilities.

In accordance with § 16-244z, the Public Utilities Regulatory Authority (PURA) initiated a proceeding to establish the procurement plan for each electric company "consistent with . . . the requirements to reduce greenhouse gas emissions in accordance with [General Statutes §] 22a-200a." General Statutes § 16-244z (a) (1) (A). In accordance with the program directives, the Department of Energy and Environmental Protection (department) developed program requirements and tariff proposals for the procurement plan, which were subject to PURA's final approval. General Statutes § 16-244z (a) (1) (C). On December 18, 2019, PURA issued a final decision approving the program requirements and tariff proposals, as modified. See Final Decision, Public Utility Regulatory Authority, "Review of Statewide Shared Clean Energy Facility Program Requirements," Docket No. 19-07-01 (December 18, 2019) (program requirements).

The program requirements provided that the electric companies would select bids with the lowest price proposals first and that the department "shall review and approve the [electric companies'] final selections before the [electric companies] submit them to PURA to ensure consistency with the [p]rogram." Accordingly, the program involves a tiered review process for bids[6] for shared clean energy facilities, pursuant to which the electric companies select the winning bids, the department reviews those selected bids for compliance with

---

[6] Although the electric companies issued a joint request for proposals, as opposed to an invitation for bids, the program requirements provide that " 'Bid' means a responsive submission by a Bidder to the procurement under this [p]rogram" and that 'Bidder' means an entity that submits a [b]id . . . ."

the program requirements, and PURA issues final approval of the selected bids.

The request was issued on April 30, 2020, consistent with the program requirements. Section 2.4.1 of the request provides in relevant part: "The Bidder must demonstrate that it has control of the generation site, or an unconditional right, granted by the property owner, to acquire such control. . . . In order to be considered to have site control for generation, the Bidder must provide copies of executed documents between the Bidder and property owner showing . . . that the Bidder owns the site or has a lease or easement with respect to the site . . . or . . . that the Bidder has an unconditional option agreement to purchase or lease the site for [a term as long as the term of the standard agreement]." Section 4.4 of the request further specifies that "[s]ubmission of the completed Bid Certification Form, including the affidavit from the owner of the project site and the applicable documentation demonstrating that the Bidder has control of the generation site, or an unconditional right, granted by the property owner, to acquire such control, represents site control." (Footnote omitted.)

The request expressly provided that "[a]ny agreement entered into for the purchase of energy and [renewable energy credits] pursuant to this solicitation is contingent upon obtaining Regulatory Approval by PURA as set forth in the Standard Agreement. Pursuant to applicable Connecticut General Statutes and PURA requirements, each [electric company] will submit required information to PURA following the completion of each annual procurement process. If any of the Bids and/or Standard Agreements do not meet the objectives of PURA, PURA may reject the Bid(s) and Standard Agreement(s). . . . The [electric companies] . . . make no commitment to any Bidder that [they] will accept any Bid(s). The [c]ompanies reserve the right to discontinue

the [request] process at any time for any reason whatsoever. This is a Request for Proposals and not a binding offer to contract." The request was for a total of five megawatts in United Illuminating's service territory.

In its April 8, 2022 memorandum of decision granting the defendants' September 7, 2021 motion to dismiss, the trial court found that, in July, 2020, "FuelCell and the plaintiff submitted bids in response to the [request] for year one of the [program] . . . . On its bid certification form, FuelCell submitted an affidavit from Richard Dziekan, the Mayor of [the city of] Derby [(city)], attesting that [the city], as the owner of the property . . . that was the subject of the energy bid [(property)], understood the site control requirements of the [request] and that FuelCell was authorized to submit a bid for a [clean energy] facility to be located on [the property]. . . . Attached to [Dziekan's] affidavit was the option to lease agreement between the city . . . and FuelCell, dated July 1, 2020. The option to lease provided FuelCell with the 'sole and exclusive right, privilege and option to lease [the property] from . . . [the city] . . . for good and valuable consideration and upon terms and conditions to be negotiated upon exercise of [the] Option.' . . . Section 4 of exhibit B to the option to lease, entitled 'Lease Terms,' provides in relevant part: 'within ninety (90) days after the date of Notice, the [c]ity and [FuelCell] shall enter into a lease agreement upon the terms and conditions set forth in [e]xhibit B attached hereto and made a part hereof, and such other terms and conditions as the [c]ity and [FuelCell] shall negotiate in good faith (the "Lease").' . . . Derek Phelps, Director of Government Relations and Business Development for FuelCell, testified at the April 1, 2022 hearing on [the defendants'] motion to dismiss that he believed when FuelCell submitted its bid certification to [United Illuminating], that the option to lease agreement for the property that it had attached

to its bid was valid and that such option to lease gave it site control of the property where it planned to construct the proposed . . . facility. . . .

"The plaintiff submitted a bid for a 4.0 megawatt solar energy project located in North Branford. . . . Fuel-Cell submitted a bid for a 2.8 megawatt natural gas-powered fuel cell located on the property. . . . [United Illuminating] reviewed FuelCell's bid, its option to lease the property agreement, lease terms and the affidavit of the [city's] Mayor as the owner of the property regarding site control. . . . [United Illuminating] found [that] FuelCell's bid satisfied the site control [requirement] and [that] the option to lease demonstrated site control. . . . On September 28, 2020, [United Illuminating] selected [FuelCell's] bid as the winning bid for a 2.8 megawatt natural gas-powered fuel cell. . . . [United Illuminating] selected two other bids for its territory. [It] selected a 1.5 megawatt solar project in Milford and . . . the plaintiff's bid but limited the [plaintiff's project] to a 700 kilowatt facility. . . .

"[In October, 2020], the plaintiff made numerous filings at PURA in an effort to invalidate FuelCell's winning bid and notified [United Illuminating] and [the department] that FuelCell's bid did not meet the site control requirement based on public records. . . . The plaintiff claimed that [United Illuminating] and [the department] were required to reject FuelCell's bid and that they knowingly accepted FuelCell's bid even though it did not meet the program requirements. The plaintiff alleged that it would have received the contract awarded to FuelCell for the energy capacity awarded to FuelCell if [United Illuminating] rejected FuelCell's bid for lack of site control. On January 22, 2021, PURA approved [United Illuminating's] selections . . . .

"Pursuant to General Statutes § 7-163[e], a public hearing was duly noticed and held on May 13, 2021,

with the city of Derby [Board of Aldermen/Alderwomen] relating to the final lease of the property. . . . On May 13, 2021, the [Board of Aldermen/Alderwomen] voted in favor of granting FuelCell the final lease in connection with the 2.8 megawatt [shared clean energy facility]. . . . On August 31, 2021, the final lease was executed between the city . . . and FuelCell." (Citations omitted.)

The present case is the third action initiated by the plaintiff in which it has sought to invalidate FuelCell's winning bid. See *Jefferson Solar*, *LLC* v. *FuelCell Energy, Inc.*, 213 Conn. App. 288, 288 A.3d 1032 (2022) (*Jefferson Solar I*), cert. denied, 346 Conn. 917, 290 A.3d 799 (2023); see also *Jefferson Solar*, *LLC* v. *Dept. of Energy & Environmental Protection*, 224 Conn. App. 688, A.3d (2024) (*Jefferson Solar II*).

In October, 2020, the plaintiff initiated *Jefferson Solar I* against FuelCell in three counts. "In count one, the plaintiff sought a declaratory ruling that the option agreement 'does not provide [FuelCell] with any legally enforceable rights' due to the city's alleged failure to comply with the requirements of the city charter and . . . § 7-163e. In count two, the plaintiff alleged that [FuelCell] had submitted 'a false bid certification' in violation of [the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.] as a result of the city's alleged failure to comply with the requirements of the city charter and § 7-163e 'prior to executing' the option agreement. In count three, the plaintiff alleged that the submission of a false bid certification by the defendants constituted tortious interference with prospective contractual relations.

"On December 10, 2020, the defendants filed a motion to dismiss [*Jefferson Solar I*], alleging, inter alia, that the plaintiff lacked standing. . . . By memorandum of decision dated April 30, 2021, the [trial] court granted

the motion to dismiss. The court first concluded that the plaintiff's request for a declaratory ruling was not ripe for adjudication, as PURA [had] not yet approved [FuelCell's] bid . . . . For the same reason, the court concluded that the plaintiff's tortious interference with prospective contractual relations claim was 'premature' and 'unripe.' The court then concluded that the plaintiff lacked standing to bring its CUTPA claim [because] its alleged injuries 'are remote and indirect.' " (Footnote omitted.) *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 213 Conn. App. 291–93. On appeal to this court in *Jefferson Solar I*, the plaintiff claimed that the court improperly dismissed its CUTPA claim for lack of standing.[7] Id., 293. On June 14, 2022, this court affirmed the judgment of dismissal, reasoning that, "[b]ecause the utility companies, by the plain terms of the request, retained discretion in awarding shared clean energy facility contracts and reserved the right to reject any or all offers, the plaintiff's purported injuries are purely speculative. . . . We, therefore, agree with the trial court's determination that the plaintiff lacked standing to maintain its CUTPA action against the defendants." (Citations omitted.) Id., 297–98.

On May 18, 2021, the plaintiff filed *Jefferson Solar II* in the Superior Court, challenging the department's decision declining the plaintiff's request for a declaratory ruling that FuelCell's option to lease was illegal and did not satisfy the site control requirement under the program. *Jefferson Solar, LLC* v. *Dept. of Energy & Environmental Protection*, supra, 224 Conn. App. 688. The Superior Court dismissed that action for lack of subject matter jurisdiction on April 27, 2022, and the plaintiff appealed. See footnote 2 of this opinion. This

---

[7] The plaintiff did not challenge the trial court's conclusion that its request for a declaratory ruling and its tortious interference claim were not ripe. See *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 213 Conn. App. 293 n.5.

court affirmed the judgment. See *Jefferson Solar, LLC* v. *Dept. of Energy & Environmental Protection*, supra, 709.

In June, 2021, while *Jefferson Solar I* was pending in this court, the plaintiff filed the underlying action against FuelCell, United Illuminating, and the department. In the operative first amended complaint the plaintiff sought (1) a declaratory ruling that FuelCell's bid did not satisfy the request's site control requirement (first count), (2) injunctive relief voiding the selection of FuelCell's bid and contract and awarding the plaintiff a contract for 3.5 megawatts instead of the 700 kilowatts it was awarded (second count), and (3) monetary damages against (i) FuelCell for its alleged violation of CUTPA (third count) and tortious interference with prospective contractual relations (fourth count) and (ii) United Illuminating and the department for violations of the filed rate doctrine (fifth count), the shared clean energy facility tariff (sixth count),[8] and the plaintiff's due process rights (seventh count) based on the selection of FuelCell's allegedly noncompliant bid.

On September 7, 2021, FuelCell and United Illuminating jointly filed a motion to dismiss for lack of subject matter jurisdiction. In their memorandum of law in support of that motion, the defendants claimed, inter alia, that the plaintiff lacked standing because it is an unsuccessful bidder on a public contract and because the

---

[8] In its operative amended complaint, the plaintiff alleged, as to counts five and six, that "[t]he tariff and filed rate doctrine prohibit [United Illuminating and the department] from allowing [FuelCell] to receive service and a contract that deviates from the tariff." The trial court subsequently explained that count five of the operative amended complaint asserted "that [the department], the Commissioner [of Energy and Environmental Protection (commissioner)], and [United Illuminating] violated the filed rate doctrine when they allowed FuelCell to receive a contract that deviates from the tariff" and that count six alleged that "[the department], the commissioner, and [United Illuminating] violated the tariff when they selected FuelCell's bid, even though FuelCell did not have site control."

plaintiff's alleged injuries were too remote and indirect to confer it with standing.[9] The plaintiff filed an objection to the motion to dismiss on October 6, 2021, and the defendants filed a reply on October 19, 2021. On November 19, 2021, the court, *Ozalis*, *J.*, heard oral argument on the defendants' motion. On January 27, 2022, the court issued an order scheduling the matter for an evidentiary hearing "to determine the facts surrounding United Illuminating's selection of [FuelCell's] bid and [FuelCell's] understanding of its option to lease when it submitted it with its . . . bid."

At the start of the evidentiary hearing on April 1, 2022, the court explained that the hearing would be limited to two questions. First, "if [FuelCell's] bid had not been accepted for any reason, would the plaintiff have 100 percent been awarded the [clean energy] capacity it desired. That's . . . from the first amended complaint, paragraph 77. And [second], was the option to lease submitted by [FuelCell] in its bid a sufficient basis to demonstrate site control required under the [request]." At the hearing, the court heard testimony from Christie Prescott, the Director of Wholesale Power Contracts for United Illuminating; Attorney Vincent Marino, the city's attorney; and Phelps.

On April 8, 2022, two months before this court issued its decision in *Jefferson Solar I*, the trial court issued its decision dismissing the underlying action as to the defendants on the grounds that the plaintiff's claims were moot and that the plaintiff lacked standing. The court first concluded that, as a disappointed bidder for a public contract, the plaintiff lacked standing to challenge the award of a public contract because it failed to demonstrate fraud, corruption, or favoritism

[9] The defendants also claimed that the plaintiff's claims were moot because FuelCell and the city had executed a final lease for the property and that the plaintiff's claims were precluded by operation of the doctrine of collateral estoppel based on the trial court's decision in *Jefferson Solar I.*

that undermined the bidding process. The court further concluded that the plaintiff lacked standing to assert its claims because its claimed damages, i.e., the lost profits from the contract that was awarded to FuelCell, were indirect and too remote from the defendants' allegedly wrongful conduct in submitting and accepting FuelCell's allegedly noncompliant bid. This appeal followed.

On appeal, the plaintiff claims that the court improperly concluded that it lacked standing to assert all the counts in its complaint against FuelCell. The seven counts of the plaintiff's complaint fall into two categories. In the first two counts, the plaintiff sought declaratory and injunctive relief and, in counts three through seven, the plaintiff sought monetary damages based on various theories. We conclude that this court's decision in *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 213 Conn. App. 297–98, is dispositive of the plaintiff's claims for monetary damages in the present case and that the trial court properly dismissed the plaintiff's claims for declaratory and injunctive relief because the plaintiff lacked standing as a disappointed bidder on a public contract.[10]

As an initial matter, we set forth the applicable standard of review. "A trial court's determination of whether a plaintiff lacks standing is a conclusion of law that is subject to plenary review on appeal." (Internal quotation marks omitted.) *R.S. Silver Enterprises, Inc.* v. *Pascarella*, 163 Conn. App. 1, 7, 134 A.3d 662, cert. denied, 320 Conn. 929, 133 A.3d 460 (2016). "[T]rial courts addressing motions to dismiss for lack of subject matter jurisdiction . . . may encounter different situations, depending on the status of the record in the case. . . . [W]here a jurisdictional determination is dependent on the resolution of a critical factual dispute, it

---

[10] For ease of discussion, we address the plaintiff's claims in a different order than they are set forth in its principal appellate brief.

cannot be decided on a motion to dismiss in the absence of an evidentiary hearing to establish jurisdictional facts." (Internal quotation marks omitted.) *Good Earth Tree Care, Inc.* v. *Fairfield*, 151 Conn. App. 680, 685, 97 A.3d 28 (2014).

When the trial court resolves disputed factual issues after an evidentiary hearing,[11] "[w]e conduct that plenary review . . . in light of the trial court's findings of fact, which we will not overturn unless they are clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *R.S. Silver Enterprises, Inc.* v. *Pascarella*, supra, 163 Conn. App. 7–8.

---

[11] The plaintiff claims that "the trial court's holding violates [the] plaintiff's due process rights and right to a jury trial because the plaintiff is not required to establish its case by a preponderance of the evidence at this stage, not having had the benefit of discovery. Nor can the court make merits findings of fact that are disputed and [are] properly within the province of the jury." Notably, not only did the plaintiff not object to the evidentiary hearing, it requested the hearing. Moreover, the trial court conducted the evidentiary hearing to determine disputed jurisdictional facts regarding the alleged misconduct in the bidding process, a procedure that our Supreme Court has endorsed. See, e.g., *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 695–96, 600 A.2d 1019 (1991) ("With respect to this issue of standing—that is bidder injury—questions of fact were raised and the trial court should have allowed an evidentiary hearing. When issues of fact are necessary to the determination of a court's jurisdiction, *due process requires that* a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." (Emphasis added; internal quotation marks omitted.)). Accordingly, the trial court did not violate the plaintiff's due process rights or its right to a jury trial by holding a limited evidentiary hearing regarding disputed jurisdictional facts in accordance with the plaintiff's own request.

I

The plaintiff claims that the trial court improperly held that its alleged injuries are too remote and indirect to provide it with standing to assert its various causes of action for monetary damages. As we previously stated, our decision in *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 213 Conn. App. 297–98, is dispositive of the plaintiff's standing to assert those claims.

On appeal in *Jefferson Solar I*, the plaintiff claimed that "the court improperly concluded that it lacked standing to maintain the CUTPA action . . . ." Id., 293. In rejecting that claim, this court first set forth the relevant legal principles regarding standing and, more specifically, the requirement that a plaintiff make a colorable claim of direct injury. Id., 293–95. The court then explained: "It is undisputed that [FuelCell], as part of its bid, submitted both the affidavit of Mayor Dziekan, in which he attested that [FuelCell] had control of the generation site, or an unconditional right . . . to acquire such control, and a copy of the option agreement between the city and FuelCell, which option was assigned to the company. Those materials demonstrate that the company's bid comported with the requirement . . . that a bidder submit proof that it has control of the generation site, or an unconditional right, granted by the property owner, to acquire such control. . . .

"In its complaint, the plaintiff alleged that the city's failure to comply with the bid process requirements of § 22 of the city charter and § 7-163e rendered the option agreement unlawful, without legal effect, and void and illusory. The plaintiff further alleged that, as a result of the city's failure to comply with those requirements, the [option agreement] does not provide the defendants with the unconditional right required by the [request] requirements. For that reason, the plaintiff alleged that the defendants had submitted a false bid certification

in violation of CUTPA, which allegedly caused the plaintiff to suffer an ascertainable loss of money because [it] will lose the revenue from the [program] that it would have received but for [the] defendants' submission of a false bid certification." (Internal quotation marks omitted.) Id., 295.

The trial court in *Jefferson Solar I* reasoned that "[t]he direct recipient of any injury resulting from false certification would be [United Illuminating], the beneficiary of the project. [United Illuminating] would presumably have at least one cause of action against the defendants. Additionally, the real party with purported unclean hands is [the city], which is claimed to have ignored its own city charter in order to furnish the option to lease to [FuelCell]. The plaintiff has not brought an action against [the city], nor does it appear that the plaintiff has standing to maintain such an action. The plaintiff's claims are remote and indirect. If there is a potential victim of [FuelCell's] alleged duplicity, it is [United Illuminating], not the plaintiff. The plaintiff lacks standing to bring the CUTPA claim." (Internal quotation marks omitted.) Id., 296.

This court agreed with that reasoning and also explained that, "[i]f [FuelCell] knowingly submitted a false bid, as the plaintiff alleges, the utility company that was a party to the contract for the shared clean energy facility would be a directly injured party and would be best suited to seek a remedy for the harm. Moreover, although the plaintiff claims that it was 100 percent certai[n] to receive the shared clean energy facility contract in question if [FuelCell] lacked the necessary site control, that contention is undermined by the plain language of the request. . . . Because the [electric] companies, by the plain terms of the request, retained discretion in awarding shared clean energy facility contracts and reserved the right to reject any or all offers, the plaintiff's purported injuries are purely

speculative." (Citations omitted; internal quotation marks omitted.) Id., 296–97. Accordingly, this court held that the plaintiff's alleged injuries—that is, the lost "revenue from the [program] that it would have received but for [FuelCell's] submission of a false bid certification"— were purely speculative. Id., 295; see also id., 297.

In the present case, the trial court likewise concluded "that the plaintiff's injuries are too remote and indirect from FuelCell's conduct to confer [on] the plaintiff standing. . . . Under the first policy factor articulated in *Ganim* v. *Smith & Wesson Corp.*, [258 Conn. 313, 347–48, 780 A.2d 98 (2002)], it would be difficult to determine the damages attributable to FuelCell's wrongdoing as opposed to other independent factors because, in all counts of the [operative] complaint, there are too many links in the chain of causation for FuelCell's conduct to be the direct cause of the plaintiff['s] not receiving its desired contract. . . .

"Under the second policy consideration, [United Illuminating] is the party directly injured by FuelCell's alleged misrepresentations because [United Illuminating] is the party [that the] plaintiff claims FuelCell allegedly made the misrepresentations to and the party [that] relied on them. Thus, [United Illuminating], as the party to a contract as to which an alleged misrepresentation was made, would suffer the direct injury resulting from FuelCell['s] not having site control. Additionally, the city . . . would be the more appropriate defendant under the facts of this case because it is the city . . . that the plaintiff claims did not comply with § 22 of its [c]harter, § 7-163e, and the statute of frauds. . . . Finally, under the third policy consideration . . . the directly injured party, [United Illuminating], can remedy the harm without these attendant problems such as indirectness of injury and apportionment of damages." (Citations omitted; footnote omitted.)

The plaintiff concedes that there is no meaningful difference between its CUTPA claim in *Jefferson Solar I* and its CUTPA claim in the present case.[12] In *Jefferson Solar I*, the plaintiff claimed "damages in an amount equal to the sum of all amounts that [the] plaintiff would have received over the twenty year term of the [shared clean energy facility] tariff contract term for the [shared clean energy facility] capacity that is obtained by [Fuel-Cell] through the use of the false bid certification that would have gone to the plaintiff plus other damages and costs to be proved at trial . . . ." In the present case, the plaintiff's claimed damages under each count for which it sought monetary damages are the same: "damages in an amount equal to the sum of all amounts that [the] plaintiff would have received over the twenty year term of the [shared clean energy facility] tariff contract term for the [shared clean energy facility] capacity that would have gone to the plaintiff but for [the defendants' wrongful conduct] . . . ." Moreover, the plaintiff's other counts seeking monetary damages are based on the same allegation that FuelCell's bid did

[12] Although the plaintiff asserted in its reply brief that "the trial court in [*Jefferson Solar I*] did not hold any factual hearing on the CUTPA claim, did not have the benefit of [FuelCell's] concessions that [it] knew its bid certification was no good, and based its decision on a different complaint with different allegations," during oral argument before this court, counsel for the plaintiff conceded that the allegations in the plaintiff's CUTPA count are the same as the allegations that were made in *Jefferson Solar I*. The respective records confirm the plaintiff's concession.

In *Jefferson Solar I*, the plaintiff alleged in its amended complaint that it "has suffered an ascertainable loss of money because the plaintiff will lose the revenue from its [shared clean energy facility] that it would have received but for [FuelCell's] submission of a false bid certification because the plaintiff would receive a contract for 700 [kilowatts] and not 3.5 [megawatts], or a smaller facility contract than it otherwise would receive." In the present case, the plaintiff likewise alleged that it "has suffered an ascertainable loss of money because the plaintiff will lose the revenue from its [shared clean energy facility] that it would have received but for [FuelCell's] submission of a false bid certification. The plaintiff has received a contract for 700 [kilowatts], and not 3.5 [megawatts], due to [FuelCell's] fraudulent and unfair and deceptive practice."

not comply with the site control requirement under the request because the option to lease was invalid. Thus, whether styled as a CUTPA claim, a tortious interference with prospective contractual relations claim, or violations of the filed rate doctrine, the tariff, or the plaintiff's due process rights, the defendants' alleged wrongful conduct and the plaintiff's claimed injuries are the same as they were in *Jefferson Solar I*—too remote and indirect to confer standing on the plaintiff.[13]

Because this court held in *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 213 Conn. App. 296–97, that the plaintiff's claimed damages were indirect and remote from the alleged wrongful conduct, that decision controls our decision in the present case in which the plaintiff concedes that it suffered the same injuries on account of the same allegedly wrongful conduct. See footnote 12 of this opinion. Although the plaintiff moved for reconsideration en banc of our decision in *Jefferson Solar I*, this court denied that motion. In effect, the plaintiff now requests that we reverse that ruling and reach a different conclusion in this appeal on the basis of the same allegations and claimed damages. We decline to do so. See *Staurovsky* v. *Milford Police Dept.*, 164 Conn. App. 182, 202–203, 134 A.3d 1263 (2016) ("[T]his court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc. . . . Prudence, then, dictates that this panel decline to revisit such requests."

_____

[13] We recognize that neither this court nor the trial court in *Jefferson Solar I* addressed the plaintiff's standing to bring its tortious interference with contractual relations claim because the trial court concluded that that claim was not ripe, and the plaintiff did not challenge that conclusion on appeal in *Jefferson Solar I*. Nevertheless, because the plaintiff's tortious interference claim was based on the same alleged wrongful conduct and injuries as were alleged in the plaintiff's CUTPA claim in *Jefferson Solar I*, this court's holding that the plaintiff lacked standing to assert its CUTPA claim applies equally to the tortious interference claim.

(Citation omitted; internal quotation marks omitted.)), appeal dismissed, 324 Conn. 693, 154 A.3d 525 (2017). Accordingly, the same reasoning employed by this court in *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 296–97, applies with equal force in the present case.

The plaintiff nevertheless contends that our decision in *Jefferson Solar I* is distinguishable because "the trial court in the first action did not hold any factual hearing on the CUTPA claim, did not have the benefit of [Fuel-Cell's] concessions that [it] knew its bid certification was no good, and based its decision on a different complaint with different allegations from the complaint here." We are not persuaded.

First, as noted in footnote 12 of this opinion, during oral argument before this court, counsel for the plaintiff conceded that the allegations in the plaintiff's CUTPA count in the present case are the same as the allegations that were made in its CUTPA count in *Jefferson Solar I*. Second, although the plaintiff suggests that the facts developed at the evidentiary hearing in the present case undermine this court's reasoning in *Jefferson Solar I*, the trial court's findings and ultimate conclusion regarding the remoteness of the plaintiff's claimed injuries in the present case are consistent with that reasoning. Specifically, the trial court in the present case concluded that "in all counts of the plaintiff's [complaint] there are too many links in the chain of causation for FuelCell's conduct to be the direct cause of the plaintiff['s] not receiving its desired contract." The court found that, although Prescott testified that, if FuelCell had been disqualified, the plaintiff likely would have been selected for the 2.8 megawatts of power awarded to FuelCell, it also explained that there was no "guarantee that [the plaintiff] would have made it through the final approval process with PURA for any portion of the 2.8 [megawatts] of power." In other words, because PURA retained discretion in awarding the contracts,

the plaintiff's claimed injuries are speculative. The evidence in the record supports the court's finding, as Phelps testified that, although Eversource had selected FuelCell's bids for three additional projects in Year 1 of the shared clean energy program, "[t]hose selections [had] to be affirmed, I'm going to say certified or finally approved by . . . PURA in the end, and that did not occur with those three projects." Similarly, in *Jefferson Solar I*, this court reasoned that, "[b]ecause the [electric] companies, by the plain terms of the request, retained discretion in awarding shared clean energy facility contracts and reserved the right to reject any or all offers, the plaintiff's purported injuries are purely speculative." *Jefferson Solar, LLC* v. *FuelCell Energy, Inc.*, supra, 213 Conn. App. 297. Accordingly, the facts developed in the present case do not alter this court's previous analysis.

Consequently, consistent with that decision, we conclude that the plaintiff lacked standing to assert its claims for monetary damages in the present case because the plaintiff's alleged injuries are indirect and remote. See id., 296–97.

## II

The plaintiff also claims that the trial court improperly concluded that it lacked standing to assert its claims for declaratory and injunctive relief because it is a disappointed bidder on a public contract that failed to establish fraud, favoritism, or corruption that undermined the bidding process. We disagree.

The following legal principles regarding an unsuccessful bidder on a public contract inform our review. "In the context of competitive bidding, it is well established that an unsuccessful bidder on a state or municipal contract has no contractual right under the common law that would afford standing to challenge the award of a contract. . . . [A] bid, even the lowest responsible

one, submitted in response to an invitation for bids is only an offer which, until accepted by the municipality, does not give rise to a contract between the parties. . . . An unsuccessful bidder, therefore, has no legal or equitable right in the contract. Not unlike any other person whose offer has been rejected, the disappointed bidder has no right to judicial intervention. . . .

"Moreover, no statute grants unsuccessful bidders standing to challenge the award of a state contract. . . . In particular, state and local competitive bidding laws have not been enacted in order to protect bidders. These laws serve to guard against abuses in the award of contracts such as favoritism, fraud or corruption and are enacted solely for the benefit of the public and in no sense create any rights in those who submit bids. . . .

"Despite these substantial constraints, [our Supreme Court has] recognized a limited exception to the rules of standing in order to provide a means of protecting *the public's interest in properly implemented competitive bidding processes.* . . . Under this exception, unsuccessful bidders have standing to challenge the award of a public contract where fraud, corruption or acts undermining the objective and integrity of the bidding process existed . . . . [S]uch a suit is brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a private attorney general. . . .

"Our policy to limit standing so as to deny some claims brought by unsuccessful and precluded bidders is designed to protect twin goals that serve the public interest in various, sometimes conflicting, ways. The standing rules aim to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the

public." (Citations omitted; emphasis added; internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 412–13, 35 A.3d 188 (2012).

In addition, "an unsuccessful bidder to a municipal contract has no standing to assert a cause of action for money damages for failure of the municipality to follow its competitive bidding laws, regardless of whether the plaintiff alleges fraud, corruption or favoritism." *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 411, 722 A.2d 271 (1999).[14] Thus, in the absence of a colorable claim of fraud, corruption or other acts undermining the integrity of the bidding process, an unsuccessful bidder lacks standing to challenge the award of a public contract. Compare *Spiniello Construction Co.* v. *Manchester*, 189 Conn. 539, 545, 456 A.2d 1199 (1983) (unsuccessful bidder had standing to challenge award of contract because evidence showed that bidding officials favored winning bidder by allowing that bidder to deviate from invitation for bids), with *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 506, 467 A.2d 674 (1983) (unsuccessful bidder lacked standing because elements traditionally thought to undermine competitive bidding process were absent when official "did not apply its requirement inconsistently or in a discriminatory fashion").

In its objection to the defendants' motion to dismiss in the present case, the plaintiff claimed that it is not properly characterized as a disappointed bidder because the shared clean energy facility contracts are not contracts with the government and because it has not

---

[14] The trial court held that the plaintiff lacked standing as a disappointed bidder to assert its claims for monetary damages pursuant to *Lawrence Brunoli, Inc.* Because we conclude in part I of this opinion that the plaintiff lacks standing to assert those claims based on this court's decision in *Jefferson Solar I*, we focus our analysis in part II of this opinion on whether the plaintiff has standing as a disappointed bidder to assert its claims for declaratory and injunctive relief.

asserted a breach of contract claim against a governmental entity. In the alternative, the plaintiff claimed that, assuming that it is a disappointed bidder on a public contract, it still has standing to seek declaratory and injunctive relief because the integrity of the bidding process was undermined when United Illuminating and the department failed to adhere to the program requirements by awarding FuelCell the contract when FuelCell did not demonstrate site control.

The trial court rejected each of the plaintiff's arguments. First, the court held that the shared clean energy facility contract is a public contract because, "although the contract is ultimately entered into between the bidder and [United Illuminating], the whole process is pursuant to a state administered program." The court next concluded that the limited exception to the standing rule did not apply because "the plaintiff's conclusory allegations do not amount to fraud, favoritism, corruption or acts that undermine the integrity of the bidding system to confer it standing under [that] exception. Additionally, there is nothing in the record to support that the bid submitted by FuelCell did not conform with the [site control requirement], as the program requirements permitted [United Illuminating] to select bids with option leases. . . .

"Moreover, there is no allegation, besides a conclusory assertion, that FuelCell knew its [option to] lease violated [the city's charter] and submitted the bid certification anyway to constitute fraud or to undermine the bidding requirements. In fact, the evidence is to the contrary. . . . [I]t is clear that [United Illuminating] did not use [the city charter] as a basis to reject some bids while ignoring [it] to award other bids. . . . Prescott, the Director of Wholesale Power Contracts for [United Illuminating], who oversaw the bid selection process for [United Illuminating], confirmed that [United Illuminating] found the option to lease submitted by FuelCell

to be acceptable under § 2.4.1 of the [request] and that neither she [n]or anyone else at [United Illuminating] was advised by someone with the proper authority that FuelCell lacked site control and granted the bid anyway to undermine the integrity of the bidding process." (Citations omitted.)

Finally, the court concluded that, "as a disappointed bidder, the plaintiff cannot request declaratory relief as a way to circumvent the fact that it does not have standing to assert its claims because [the declaratory judgment statute] does not create jurisdiction where it would not otherwise exist." (Internal quotation marks omitted.) Accordingly, the court held that the plaintiff lacked standing as a disappointed bidder.

On appeal, the plaintiff contends that the court improperly concluded that the shared clean energy facility contracts are public contracts. It argues that, although the shared clean energy facility "contracts are a public benefit made available to renewable energy developers, the . . . bids are not bids for a contract with a municipality or with any governmental agency. . . . The [shared clean energy facility] contracts at issue are not public contracts under *Ardmare* [*Construction Co.* v. *Freedman*, supra, 191 Conn. 497] because the state is not a counterparty. See, e.g., *Connecticut Energy Marketers Assn.* v. *Dept. of Energy & Environmental Protection*, 324 Conn. 362, 374 [152 A.3d 509] (2016) (holding that 'activities that are proposed by state actors, but which are ultimately performed by private entities' are not state activities)." We are not persuaded.

The plaintiff's reliance on our Supreme Court's holding in *Connecticut Energy Marketers Assn.* is misplaced. In that case, the court addressed whether the department's "issuance of a comprehensive energy strategy . . . pursuant to a legislative directive, and

the subsequent approval of a plan to expand the use of natural gas in this state by the department and [PURA] constituted "'actions which may significantly affect the environment'" within the meaning of General Statutes § 22a-1c, thereby triggering the requirement for written evaluation of the expansion plan's environmental impact pursuant to General Statutes § 22a-1b (c)." (Footnote omitted.) Id., 364–65. The court held that "activities that are proposed by state actors, but which are ultimately performed by private entities, do not constitute 'actions which may significantly affect the environment' for purposes of § 22a-1b (c)." Id., 374. Because *Connecticut Energy Marketers Assn.* involved an entirely different statutory scheme that is not at issue in the present case, our Supreme Court's holding in that case does not resolve the issue presented in the present case—whether the shared clean energy facility contract constitutes a public contract for purposes of the disappointed bidder doctrine.

In that regard, we recognize that neither the state nor any municipality is a party to the contract that was awarded to FuelCell. At the same time, the crux of each count of the plaintiff's complaint is that FuelCell's bid failed to comply with the request or the program requirements that were developed by the department and approved by PURA in accordance with express legislative directives. See General Statutes § 16-244z (a) (1) (C) (department "shall . . . develop program requirements and tariff proposals for shared clean energy facilities" and PURA "shall approve or modify such program requirements and tariff proposals submitted by the department"); see also General Statutes § 16-244z (a) (6) (providing that department's program requirements "shall include" several specific provisions and requirements). Thus, although this is not the typical disappointed bidder case in which a state or local government is a party to the contract, the plaintiff seeks

to challenge the award of a contract pursuant to competitive bidding in a public procurement process, which was developed by and subject to the oversight of two different state agencies. Indeed, the plaintiff's claims depend on the lowest responsible bidder requirement to establish that it would have been awarded the contract, which is the hallmark of a public procurement process. See, e.g., *Powder Horn Constructors, Inc.* v. *Florence*, 754 P.2d 356, 376 (Colo. 1988) (noting that public procurement process is "designed to avoid the appearance . . . of favoritism . . . in public procurement by awarding the contract in all cases to the lowest responsible bidder," whereas "[p]rivate parties are not required to accept the lowest bid").

Specifically, in the operative complaint, the plaintiff alleged that the electric companies "have no discretion in terms of whether they enter into contracts with successful bidders. The contracts are required to be entered into under . . . § 16-244z and [the program requirements]. . . . Nor do the [electric companies] have any discretion as to the basis for selection, which is based upon price for qualified bids as provided for by the tariffs." The plaintiff further alleged that, notwithstanding "the usual boilerplate disclaimer language that purported to reserve to the [electric companies] 'the right to reject any or all offers or proposals' . . . and that the [electric companies] 'make no commitment to any [b]idder that it will accept any [b]id(s)' and that the [request] does not constitute 'a binding offer to contract' . . . the legal and practical reality is that neither [electric company] had the discretion to reject any and all offers unless those offers failed to satisfy the requirements of the tariff, which incorporates the . . . program requirements." (Citation omitted; emphasis omitted.)

Consequently, the plaintiff's reliance on the program requirements to challenge the award of the contract in

the present case is no different than a disappointed bidder's reliance on the state or municipal bidding statutes to challenge the award of a government contract. That is, the program requirements, much like competitive bidding laws, were established for the benefit of the public—not the bidders. See, e.g., General Statutes § 16-244z (e) ("The costs incurred by an electric distribution company pursuant to this section shall be recovered on a timely basis through a nonbypassable fully reconciling component of electric rates for all customers of the electric distribution company. Any net revenues from the sale of products purchased in accordance with any tariff offered pursuant to this section shall be credited to customers through the same fully reconciling rate component for all customers of such electric distribution company.").

Therefore, applying our well established standing rules regarding disappointed bidders on public contracts to the present case represents a "proper balance between fulfilling the purposes of the competitive bidding [rules] and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public." (Internal quotation marks omitted.) *Electrical Contractors*, *Inc.* v. *Dept. of Education*, supra, 303 Conn. 413. Accordingly, we agree with the trial court that the shared clean energy facility contract awarded pursuant to the request is a public contract.

The plaintiff contends that "even if the contract was a public contract . . . the trial court's conclusion . . . that FuelCell did not know or have reason to know that its lease option was unenforceable is disproven by the testimony at the hearing." According to the plaintiff, "at the time [FuelCell] submitted its . . . bid, [FuelCell] knew, or at the very least had reason to know, that the option to lease and bid certification was no good and did not provide [FuelCell] with control to

anything, much less unconditional control." The plaintiff further maintains that the integrity of the bidding process was undermined when United Illuminating "ignored the [program requirements] on which [the] plaintiff relied when it expended funds necessary to submit a compliant bid." The plaintiff's arguments are unavailing.

The court rejected the plaintiff's "conclusory allegations" that fraud, favoritism, corruption, or other acts undermined the integrity of the bidding process because "there is nothing in the record to support that the bid submitted by FuelCell did not conform with the [site control requirement], as the program requirements permitted [United Illuminating] to select bids with option leases." The court relied on testimony from Prescott, who evaluated the bids for United Illuminating, and found that FuelCell's bid complied with the site control requirements. The court specifically noted that there was no evidence that United Illuminating applied the site control requirement differently to other bidders and, therefore, it would not disturb the bidding official's good faith interpretation of the bidding requirements. Put differently, the court found that United Illuminating did not exhibit favoritism by interpreting and applying the program requirements in a consistent and nondiscriminatory fashion. See *Good Earth Tree Care, Inc.* v. *Fairfield*, supra, 151 Conn. App. 685 (bidding officials do "not exhibit favoritism by making good faith interpretations of bidding requirements and applying them in a consistent and nondiscriminatory fashion").

Accordingly, the plaintiff's assertion, based on its reading of the option to lease and the city charter, that FuelCell knew that its bid certification was false does not alter the court's conclusion that there was no fraud, favoritism, or corruption that undermined the integrity of the bidding process. At bottom, the plaintiff simply disagrees with United Illuminating's, PURA's, and the

department's application of the bidding requirements and seeks to obtain judicial intervention to set aside the award of a public contract on the basis of its own interpretation of the bidding requirements. The plaintiff's interpretation, however, has been rejected by those entities, and the plaintiff has failed to demonstrate that their good faith assessments of their own bidding requirements amount to fraud, favoritism or corruption that undermined the integrity of the bidding process. It is well settled that, "[a]lthough the assessment of the criteria for determining the lowest qualified bidder includes some subjective analysis, that subjective analysis . . . does not carry with it the imprint of favoritism, but rather is a wholly permissive exercise of the [bidding official's] discretion unless favoritism otherwise is illustrated." (Internal quotation marks omitted.) Id., 686. Thus, although the plaintiff asserts that it seeks to vindicate the "public interest in ensuring that government agencies adhere to the law," it has failed to allege facts to support its claim that fraud, corruption or favoritism undermined the bidding process. See *AAIS Corp.* v. *Dept. of Administrative Services*, 93 Conn. App. 327, 332–33, 888 A.2d 1127 (unsuccessful bidder lacked standing to seek injunctive relief because there was "no allegation that any ex parte communications with other bidders took place or that the department was favoring the use of one brand of product over another in the bidding process"), cert. denied, 277 Conn. 927, 895 A.2d 798 (2006). Consequently, we conclude that the plaintiff, as a disappointed bidder on a public contract, lacked standing to challenge the award of the contract because it failed to demonstrate fraud, corruption or favoritism that undermined the integrity of the bidding process. Therefore, the court properly dismissed the plaintiff's claims for declaratory and injunctive relief.

The judgment is affirmed.

In this opinion the other judges concurred.